In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-1839, 08-1860

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/*
*Cross-Appellant*,

*v.*

CHARLES FARINELLA,

*Defendant-Appellant/*
*Cross-Appellee*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 487—**William J. Hibbler**, *Judge*.

ARGUED FEBRUARY 17, 2009—DECIDED MARCH 12, 2009

Before POSNER, KANNE, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant was convicted by
a jury of wire fraud, 18 U.S.C. § 1343, and of introducing
into interstate commerce a misbranded food with intent
to defraud or mislead. 21 U.S.C. §§ 331(a), 333(a)(2).
The judge sentenced him to five years' probation (includ-

ing six months of home confinement) and to pay a $75,000 fine and forfeit the net gain from the offense, which was in excess of $400,000. The government's cross-appeal challenges the sentence as too lenient. The defendant's appeal primarily argues that there was insufficient admissible evidence to convict him of misbranding. The briefs contain no separate discussion of the wire-fraud charge, and we construe the statement in the government's brief that the misbranding count was "the basis of" the wire-fraud charge as a concession that if the misbranding charge falls, the wire-fraud charge falls with it.

The facts, stated as favorably to the government as the record permits, but without extraneous detail, are as follows. In May 2003 the defendant bought 1.6 million bottles of "Henri's Salad Dressing" from ACH Foods, which in turn had bought it from Unilever, the manufacturer. The label on each bottle said "best when purchased by" followed by a date, which had been picked by Unilever, ranging from January to June 2003. ACH had purchased Henri's Salad Dressing from Unilever when the "best when purchased by" date was approaching. The intention was to sell the salad dressing to consumers through discount outlets. The defendant accordingly resold the salad dressing he bought from ACH to "dollar stores," which are discount stores, but before doing so he pasted, over the part of the label that contains the "best when purchased by" date, on each bottle, a new label changing the date to May or July 2004. The government calls these the dates on which "the dressing would expire." That is itself false and misleading, and is part of a

pattern of improper argumentation in this litigation that does no credit to the Justice Department. The usage echoes the indictment and was employed repeatedly by the prosecution at trial; in her opening argument the principal prosecutor said that "it's a case about taking nearly two million bottles of old, expired salad dressing and relabeling it with new expiration dates to pass it off as new and fresh . . . . [N]obody wants to eat foul, rancid food." The term "expiration date" (or "sell by" date, another date that the government's brief confuses with "best when purchased by" date) on a food product, unlike a "best when purchased by" date, has a generally understood meaning: it is the date after which you shouldn't eat the product. Salad dressing, however, or at least the type of salad dressing represented by Henri's, is what is called "shelf stable"; it has no expiration date.

ACH had faxed the defendant that it would guarantee the freshness of the salad dressing for up to 180 days past the "best when purchased by" date, but the dates that he had affixed to them were more than 180 days after the dates that Unilever had picked. ACH received some complaints about the relabeling, though none about the taste or other qualities of the salad dressing, and complained in turn to the defendant, who stated that he had checked with the Food and Drug Administration and that the relabeling was okay. He had not checked with the FDA. He made other false statements as well, but they are not the basis of the misbranding charge, because they are not statements that appeared on the labels that he put on the bottles. That charge, upon which

as we said the government's entire case is based, is limited to the change of the "best when purchased by" dates on the labels. It is conceivable that ACH or Unilever might have a tort or contract claim against the defendant for altering the "best when purchased by" date and pretending to have been authorized by the FDA to do so, but that has nothing to do with this criminal case.

It is important to understand what else this case does not involve, and also what is not in the record—the omissions are more interesting than the scanty contents of the government's threadbare case. There is no suggestion that selling salad dressing after the "best when purchased by" date endangers human health; so far as appears, Henri's Salad Dressing is edible a decade or more after it is manufactured. There is no evidence that the taste of any of the 1.6 million bottles of Henri's Salad Dressing sold by the defendant had deteriorated by the time of trial—four years after the latest original "best when purchased by" date—let alone by the latest relabeled "best when purchased by" date, which was 18 months after Unilever's original "best when purchased by" date. There is no evidence that any buyer of any of the 1.6 million bottles sold by the defendant has ever complained about the taste.

The term "misbranded food" is defined in some detail in 21 U.S.C. § 343, but there is nothing there about dates on labels, so that the defendant's conduct if illegal is so only if it can be said to be "false or misleading in any particular." § 343(a)(1). No regulation issued by the Food and Drug Administration, or, so far as we are in-

formed, by the Federal Trade Commission or any other body, official or unofficial, defines "best when purchased by" or forbids a wholesaler (as here) or retailer to change the date. There is evidence that Unilever picked the "best when purchased by" dates on the basis of tests that it conducted, but the tests were not described at the trial and we do not know whether for example they are taste tests.

There is also and critically nothing in the record concerning consumers' understanding of the significance of "best when purchased by." Without evidence of that understanding, whether the defendant's redating was misleading cannot be determined. No consumer evidence was presented, whether as direct testimony or in survey form. The government's able appellate lawyer surprised us by arguing that if the manager of a grocery store, after tasting Henri's Salad Dressing, decided that there was no diminution of flavor after two years and relabeled the bottles accordingly, he would be guilty of the crime of misbranding, just like the defendant. Conceivably consumers understand the "best when purchased by" date to refer to a date picked by the manufacturer, but there is no evidence of that and it is not, as the government believes, self-evident.

No evidence was presented that "best when purchased by" has a uniform meaning in the food industry. The government wants us to believe that it is a synonym for "expires on" but presented no evidence for this interpretation, and indeed argues the point by innuendo, simply by substituting in its brief, as in the indictment

and in the prosecution's statements at the trial in the hearing of the jury, "expires on" for "best when purchased by."

The parties have found no previous case, either criminal or civil, and no administrative proceeding, in which alteration of the "best when purchased by" date was challenged as unlawful. As far as the evidence shows, any firm in the chain of production and distribution that leads from the manufacturer to the ultimate consumer can make its own judgment of when the taste of the product is likely to deteriorate. For all we know, the date is determined less by a judgment about taste than about concern with turnover. The manufacturer might want to affix an early "best when purchased by" date so that his distributors would be more inclined to repurchase the product within a reasonably short time, so that he has more sales. Admittedly, this is speculation, for while a date in the near future will increase turnover it will do so at the cost of making each bottle less likely to be sold at retail, and hence less valuable. Grocery stores pay less for bottles that are less likely to be sold. The cost of restocking shelves more frequently also would drive down the price to the manufacturer.

Another possibility is that labeling a product with a "best when purchased by" date is a method of price discrimination. After that date, products are not destroyed, for they are not only safe but also, as far as the record shows, of undiminished quality for an indefinite time. But well-off consumers prefer to buy before that date, and after the date passes the product will be sold at

a discount in dollar stores or their equivalent, catering to less well-off consumers. In economic lingo, the label invites consumers to sort themselves into two groups, one of less-elastic demanders willing to pay a higher price for what may or may not be a higher-quality good and the others preferring the discount.

So was the defendant ripping off the consumer by selling salad dressing after its "best when purchased by" date had passed, without disclosing the fact? Apparently not, because it sold the salad dressing to dollar stores rather than to stores that cater to consumers who would not buy a product after its "best when purchased by" date.

Still another possibility is that "best when purchased by" is just a guarantee by the seller, in this case by the defendant—a time-limited warranty. If so, then a consumer who had a bad experience with a bottle of salad dressing used before the "best when purchased by date" affixed by the defendant would be entitled to a refund because the defendant, and the retailers to whom he sold the salad dressing and who we assume (though again there is no evidence) did not alter the date, had implicitly guaranteed "bestness" up to that date.

All this is speculation, but it is less implausible speculation than the government's that consumers think "best when purchased by" means "expires on," so that if they knew that the manufacturer's "best when purchased by" date had passed they would not dream of buying the product no matter how steeply it was discounted.

In mid-trial the government was permitted to call as an expert witness an employee of the Food and Drug Admin-

istration. He testified that the FDA has a database of inquiries regarding the relabeling of food products, that he had looked in the database, and that he had found no record of an inquiry from the defendant concerning the relabeling of salad dressing. The implication was that changing the "best when purchased by" date on a label requires the FDA's permission, and he added that the FDA requires supporting data before approving a request to change the date. This evidence, to which the defendant vociferously objected, should not have been admitted. If there is a requirement that the FDA's approval must be obtained before a "best when purchased by" date may be changed, it would, to be a lawful predicate of a criminal conviction, have to be found in some statute or regulation, or at least in some written interpretive guideline or opinion, and not just in the oral testimony of an agency employee. It is a denial of due process of law to convict a person of a crime because he violated some bureaucrat's secret understanding of the law. "The idea of secret laws is repugnant. People cannot comply with laws the existence of which is concealed." *Torres v. INS*, 144 F.3d 472, 474 (7th Cir. 1998); see *George Campbell Painting Corp. v. Chao*, 463 F. Supp. 2d 184, 190-91 (D. Conn. 2006); *Oppenheimer Mendez v. Acevedo*, 388 F. Supp. 326, 335 (D.C. Puerto Rico 1974).

Moreover, the law (unless foreign) that a jury applies is the law given to it by the judge in his instructions, not the legal opinion offered by a witness, including an expert witness. *United States v. Chube II*, 538 F.3d 693, 701 (7th Cir. 2008); *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 (9th Cir.

2008). District judges, rather than witnesses, must explain to juries the meaning of statutes and regulations. *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 901 (7th Cir. 1994).

The testimony of the FDA's employee was not just improper and inadmissible but incoherent. He testified that he did *not* know what "the FDA say[s] about best when purchased by dates." When shown the "best when purchased by" date on a bottle and asked what it meant he said he did not know. He also said—contradicting his own testimony that altering the date is misbranding— that "the FDA doesn't have the authority to regulate expiration dates." Then he said that it did. He never explained the basis for either of his contradictory statements concerning his agency's authority.

The prosecutor told the judge that if there is a "best when purchased by" date on the label of a food product "and it's changed[,] that is a violation of the Food, Drug and Cosmetic Act." That is false.

The government is left to argue that *any* change on the label of a food product is misbranding, whatever consumers understand. But it doesn't believe that either, because its lawyer told us at argument that a knowingly false statement that Henri's Salad Dressing is the most delicious salad dressing in the world would be mere "advertising" and thus (but why "thus"?—misbranding includes false advertising on a food label) not actionable as misbranding.

We do not suggest that a novel fraud can never be punished as a crime. But to prove a person guilty of having

made a fraudulent representation, a jury must be given evidence about the meaning (unless obvious) of the representation claimed to be fraudulent, and that was not done here. We remind that one possible meaning of "best when purchased by" is that it is a guarantee by the seller that if purchased by then (and, presumably, eaten within a reasonable time afterward) it will taste as good as when it was first sold; if this is the meaning that consumers attach to the phrase, there was no misrepresentation.

Because the government presented insufficient evidence that the defendant engaged in misbranding, he is entitled to be acquitted. But since there was insufficient evidence, why did the jury convict? Perhaps because of a series of improper statements by prosecutor Juliet Sorensen in her rebuttal closing argument, for which the government in its brief (which she signed) belatedly apologizes (belatedly because the government defended the remarks emphatically in the district court). The brief says that "the remarks which drew sustained objections were improper, because they cast the defendant's exercise of his constitutional right to counsel in a negative light."

Indeed they were and they did. The reference to these "sustained objections" by the defendant's lawyer is to objections to two statements made by the prosecutor to the jury. After the court sustained the defendant's objection to the first statement—"Ladies and gentlemen, don't let the defendant and his high-paid lawyer buy his way out of this"—she said to the jury: "Black and white

in our system of justice, ladies and gentlemen. You have to earn justice. You can't buy it." The judge sustained an objection to this statement too. That was too weak a response. He should have made clear to the prosecutor after sustaining the first objection that one more false step and he would declare a mistrial. The prosecutor's second statement was worse than the first, because it could be understood as a warning that the defendant might try to obtain an acquittal by bribery.

There were additional improprieties, not acknowledged and for the most part not even discussed by the government in its brief. The prosecutor told the jury that the "best when purchased by" date "allows a manufacturer to trace the product if there is a consumer complaint, if there is illness, if there is a need to recall the product." The implication is that by altering the "best when purchased by" date the defendant had prevented the manufacturer from tracing the product in order to prevent it from causing illness. If that were true, the FDA presumably would require that the date not be altered, and it does not require that; in any event there was no evidence that a bottle of Henri's Salad Dressing consumed before or for that matter after the altered "best when purchased by" date could make anybody ill.

In like vein the prosecutor told the jury that if what the defendant "did was business as usual in the food industry, I suggest we stop going to the store right now and start growing our own food." That was a veiled reference to the nonexistent issue of safety, which she pressed further when she said that "in spite of all this talk about

the quality of the dressing, I don't see them opening any of these bottles and taking a whiff." The implication, which has no basis in the evidence, was that the dressing in some of the bottles was rotten. She told the jury that the defendant was indifferent to "safety" and that "the harm caused by the fraud was to public confidence in the safety of the food supply." (The government repeats this in its brief; there is no basis in the evidence for the remark.) She also called the bottles of salad dressing "truckfulls of nasty, expired salad dressing," which was another groundless comment about quality and safety. She said that after the "expiration date" the salad dressing was no longer "fresh" and that the defendant had "had to convert the expired dressing into new, fresh product," a proposition that is not completely intelligible, but sounds ominous.

The government could have performed tests on the salad dressing to determine its freshness—perhaps the same tests that Unilever had performed. It did not do so, or, if it did, it did not present the results at trial. In her closing argument the prosecutor 14 times substituted "expiration date" or "expires" for "best when purchased by"—14 further improprieties, which grew to 20 in the government's main appeal brief by virtue of its using "sell-by date" as a synonym for "expiration date."

We asked the government's lawyer at argument what an appropriate sanction for the prosecutor's misconduct might be. We are not permitted to reverse a judgment on the basis of a lawyer's misconduct that would not have caused a reasonable jury to acquit, *United States v. Hasting*,

461 U.S. 499, 505-06 (1983); *United States. v. Boyd*, 55 F.3d 239, 241-42 (7th Cir. 1995), but in this case, had the government presented enough evidence to sustain a conviction, we would have reversed the judgment and ordered a new trial on the basis of the prosecutor's misconduct. That sanction is not available only because the government presented so little evidence that the defendant is entitled to an acquittal. That does not detract from the gravity of the prosecutor's misconduct and the need for an appropriate sanction. The government's appellate lawyer told us that the prosecutor's superior would give her a talking-to. We are not impressed by the suggestion.

Since we are directing an acquittal on all counts, the sentencing issues are academic and we do not address them, beyond expressing our surprise that the government would complain about the leniency of the sentence for a crime it had failed to prove.

REVERSED.