In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3000

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DOLI SYARIEF PULUNGAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07-CR-144-BBC—**Barbara B. Crabb**, *Chief Judge*.

ARGUED MAY 15, 2009—DECIDED JUNE 15, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER and FLAUM, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Federal law prohibits the export of "defense articles" without a license. 22 U.S.C. §2778. A "defense article" is any item on the United States Munitions List, which §2778(a) authorizes the President to promulgate. The President has delegated that power to the State Department's Directorate of Defense Trade Controls. The Munitions List includes "[r]iflescopes

manufactured to military specifications." 22 C.F.R. §121.1 Category 1(f). Designations are not subject to judicial review. 22 U.S.C. §2778(h).

Doli Pulungan tried in 2007 to export 100 Leupold Mark 4® CQ/T® riflescopes (made in Oregon by Leupold & Stevens, Inc.). He planned to transship through Saudi Arabia to Indonesia in order to conceal the destination, because his clients told him that the United States had an embargo on military exports to Indonesia. There had been such an embargo between 1999 and 2005, but there was none when Pulungan tried to acquire and export the 'scopes. He was charged with violation of §2778(c), however, on the theory that the Leupold Mark 4 CQ/T riflescope is "manufactured to military specifications." A jury found him guilty of attempting to export defense articles without a license, and the judge sentenced him to 48 months' imprisonment.

Section 2778(c) makes it a crime to violate (or attempt to violate) any part of §2778 "willfully". The parties agree that "willfully" means with knowledge that a license is required. Pulungan concedes that he attempted to acquire and export Leupold Mark 4 CQ/T riflescopes to Indonesia without a license. But he contends that the prosecution did not prove that these 'scopes are "manufactured to military specifications"—and that, even if they are so manufactured, he did not know it and therefore lacked the required mental state.

Pulungan contends that the prosecution must prove, beyond a reasonable doubt, that the Leupold Mark 4 CQ/T riflescope was "manufactured to military specifica-

tions"—just as the prosecution must prove in a prosecution for distributing cocaine that the substance is cocaine rather than sugar. The prosecutor addressed this topic through the testimony of Anthony Dearth, who testified that the Directorate of Defense Trade Controls has concluded that the Leupold Mark 4 CQ/T is "manufactured to military specifications"—but he would not say what those specifications are or why the Directorate believes that the Mark 4 CQ/T is "manufactured to" them. The decision itself was not produced.

After Dearth testified, the prosecutor asked the judge to instruct the jury that, as a matter of law, the Leupold Mark 4 CQ/T riflescope is "manufactured to military specifications." The judge gave the requested instruction, taking the issue out of the jury's hands. The judge agreed with the prosecutor that §2778(h) prevents any inquiry, by either judge or jury, into the propriety of an item's classification. The judge confirmed this ruling after trial when denying Pulungan's motion for acquittal. 561 F. Supp. 2d 1019 (W.D. Wis. 2008). Pulungan disputes this understanding of §2778(h) and adds that, if the prosecutor is right, then the defendant's sixth amendment right to trial by jury supersedes the statute. See *United States v. Gaudin*, 515 U.S. 506 (1995) (in a prosecution for fraud, the judge must allow the jury to decide whether the false statements were material; the judge may not treat materiality as a matter of law).

Section 2778(h) provides: "The designation by the President (or by an official to whom the President's functions . . . have been duly delegated), *in regulations*

issued under this section, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review." (Emphasis added.) So if 22 C.F.R. §121.1 Category 1(f) read "any Leupold Mark 4 CQ/T riflescope", that designation would be incontestable (even though made by the Directorate rather than the President), and the question for the jury would be whether the item that Pulungan tried to export was indeed a Leupold Mark 4 CQ/T riflescope. If Pulungan had conceded that the Leupold Mark 4 CQ/T riflescope is "manufactured to defense specifications", he could not avoid liability by arguing that the Munitions List should not require licenses for these items. See *United States v. Martinez*, 904 F.2d 601 (11th Cir. 1990). But he does not concede that the Leupold Mark 4 CQ/T riflescope is within the domain of 22 C.F.R. §121.1 Category 1(f).

The only *regulation* is that "[r]iflescopes manufactured to military specifications" require export licenses. It is easy to see why the regulation's language deals with attributes rather than names; an effort to enumerate each item would be futile, not only because some are bound to be overlooked (imagine a regulation that tried to list all bicycles by manufacturer and model number) but also because manufacturers change their designations. The Mark 4 may be succeeded by a Mark 5, or the CQ/T model may become the CQ/X. But while a narrative description may be the most sensible way to proceed, it also limits the effect of §2778(h). Only material "in regulations" is covered by that statute. The Directorate's conclusion that the Leupold Mark 4 CQ/T riflescope is "manufactured to military specifications" is not in a regulation and so is unaffected by §2778(h).

The Directorate's claim of authority to classify any item as a "defense article," without revealing the basis of the decision and without allowing any inquiry by the jury, would create serious constitutional problems. It would allow the sort of secret law that *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), condemned. (That case dealt with an unpublished regulation that remained "in the hip pocket of the administrator," a serious problem apart from the nondelegation holding usually associated with *Panama Refining*.) A regulation is published for all to see. People can adjust their conduct to avoid liability. A designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian régimes. Government must operate through public laws and regulations. See *United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009). Thus the United States must prove, and not just assert, that the Leupold Mark 4 CQ/T riflescope is "manufactured to military specifications."

It does not necessarily follow that proof must come in open court. Congress has made some special provisions for classified information—and both the manufacturing details of the Leupold Mark 4 CQ/T riflescope and the precise specifications for military 'scopes may be classified as state secrets; some details also may be trade secrets. Until Congress enacted the Classified Information Procedures Act, 18 U.S.C. App. 3 §§ 1–16, defendants frequently engaged in "greymail"—they threatened to expose secrets as the price of successful prosecution, which

induced the government to dismiss the indictments or prosecute for less serious crime. The Classified Information Procedures Act is designed to allow disputes involving material legitimately kept secret to be resolved without unnecessary public disclosures.

Pulungan's lawyer said at oral argument that he had not asked for a hearing under this statute. Nor did the prosecutor offer one. Both took an all-or-nothing approach: Pulungan demanded a public jury trial, and the prosecutor total secrecy. We need not decide whether either litigant has waived or forfeited its position by disdaining the statutory middle ground—or whether any error is harmless (Pulungan has never argued that the Mark 4 CQ/T 'scope is not actually a mil-spec product and didn't ask for an expert to explore that subject)—because Pulungan is entitled to prevail even if the criminal-justice system must proceed on the assumption that the Mark 4 CQ/T riflescope is a "defense article."

It is not enough for the Leupold Mark 4 CQ/T riflescope to *be* a "defense article." Pulungan cannot be convicted unless he *knew* that it is one, and that licenses are necessary to export them. The United States concedes that the word "willfully" in §2778(c) requires it to prove that the defendant knew not only the material facts but also the legal rules. (We need not decide whether the concession is correct. "Willfully" is a notoriously plastic word. See *Bryan v. United States*, 524 U.S. 184 (1998).)

That the Directorate's determination about the status of the Leupold Mark 4 CQ/T riflescope was unknown to the general public until Pulungan's trial makes it hard to

show his knowledge. Some people in the business knew the Directorate's view. Leupold & Stevens itself asked after bringing the 'scope to market in 2002, and the Directorate replied in 2003 that the Mark 4 CQ/T is covered as a "defense article." But Pulungan was not an industry insider, nor were his potential customers (he says that his clients were civilian police departments). The United States does not contend that Pulungan knew what the Directorate told Leupold & Stevens in 2003, or indeed knew that the firm had even made an inquiry.

The United States offered three kinds of proof on the subjects of knowledge and intent. It observed, first, that Pulungan had in his possession printouts of web pages at the site Telescopes.com that limit the countries available for shipment. It showed, second, that Pulungan lied to his business associates about how many riflescopes he wanted and where they would be sent. The prosecutor contends that these lies, coupled with a willingness to pay above-market prices ($1,000 per Leupold 'scope, when retailers charge only $700), show that he knew that his proposed transaction of 100 riflescopes to Indonesia was unlawful. Third, Pulungan sent email messages and made notes evincing a belief that munitions exports to Indonesia were unlawful; the prosecutor submits that Pulungan has effectively conceded intending to violate the law.

Let us start with the first of these. Telescopes.com advised its customers that "[w]e are allowed to ship riflescopes, laser sights and riflescope accessories only to certain countries." And one of the web pages devoted to

the Leupold Mark 4 CQ/T riflescope contained this text, in bold red type: "We cannot export this item outside the U.S." The prosecutor says that a jury could infer from Pulungan's possession of these statements that he knew that a license was required to export the Leupold Mark 4 CQ/T riflescope. The problem with this inference is obvious: Telescopes.com did not say *why* the available destinations are limited. Its web pages seemed to say that the Leupold Mark 4 CQ/T riflescope cannot be exported (at least not by Telescopes.com) even if the buyer *has* a license.

And there may be a very good reason. Perhaps Telescopes.com had a restricted territory. It is common for a manufacturer to authorize a dealer to sell in one country but not another. Leupold & Stevens may ship directly to dealers in foreign nations (getting licenses if necessary) and forbid any of its dealers to ship across international borders. Such limits can be enforced through trademark and patent laws, whether or not a given nation's contract or antitrust laws recognize vertical restrictions on dealers' sales territories. To see the absence of a link between no-export notices and military technology, look at almost any web page at Amazon.com devoted to electronic equipment. The web page for every USB flash-memory stick—a commodity item that is manufactured outside this nation, and thus unaffected by export-control laws—contains the statement: "Currently, item can be shipped only within the U.S." That's pretty much what Telescopes.com told Pulungan about the Leupold Mark 4 CQ/T riflescope. The same legend can be found on Amazon's pages for

some movie DVDs and other copyrighted material. And Amazon's page for LaraBar Jocalat orange milk chocolate says: "Currently, item can be shipped only within the U.S." The military may run on coffee and chocolate, but that does not make either a "defense article."

At the Telescopes.com web site, quite a few pages for binoculars say: "Only ships in contiguous USA". Telescopes.com no longer sells riflescopes, but OpticsPlanet.com, which does, does not display a USA-only shipping restriction on its page for the Leupold Mark 4 CQ/T riflescope. We conclude that no reasonable jury could infer from the presence, or absence, of a USA-only shipping legend on a commercial web site that a would-be buyer knows that the item is, or is not, a "defense article."

The prosecutor's second and third reasons may be taken together. They show convincingly that Pulungan *believed* that what he was doing was illegal. The problem is that they evince a belief in a nonexistent rule (the embargo that had been lifted two years earlier) rather than a belief that an export license was necessary.

As the prosecutor sees things, an intent to violate one law is as good as the intent to violate any other. The United States' appellate brief essentially invokes the doctrine of transferred intent (though it does not use that name or cite authority). If you set out to kill A by poisoning his whiskey, and B drinks from the glass first and dies, you are guilty of B's premeditated murder: The intent to kill A is "transferred" to B's death. See *Bradshaw v. Richey*, 546 U.S. 74 (2005); see also Wayne R. LaFave, 1 *Substantive Criminal Law* §5.2(c) (2d ed. 2003); Anthony M.

Dillof, *Transferred Intent: An Inquiry into the Nature of Criminal Culpability*, 1 Buff. Crim. L. Rev. 501 (1998); *Model Penal Code* §2.03 (1962). So far as we can tell, however, transferring intent from one genus of offense to another has never been permitted. Suppose Pulungan had believed (wrongly) that the United States imposes an excise tax on exports of optical gear and had tried to avoid payment; an intent to evade a nonexistent tax would not transfer to an intent to export riflescopes without a license; the crimes are too different for one intent to suffice for the other.

The crime that Pulungan set out to commit was unrelated to unlicensed exports. An embargo on sales to Indonesia would not have prevented a shipment to Saudi Arabia; it is only the intent to transship in Saudi Arabia that would have created a legal problem (had there been an embargo). It would be a stretch to treat "intent to transship lawfully exported riflescopes" as equivalent to "intent to export riflescopes without a required license." Both crimes are *malum prohibitum* rather than *malum in se*—that is, they are regulatory offenses rather than acts evil in themselves under widely held moral codes—and the "willfullness" element in a regulatory offense such as §2778(c) is designed to require knowledge of *this* rule, rather than of some other actual or potential regulation. See *Staples v. United States*, 511 U.S. 600 (1994); *Cheek v. United States*, 498 U.S. 192 (1991).

No matter. Suppose that intent can be transferred from a nonexistent embargo to a licensing requirement. Still, the United States has conceded that §2778(c) requires proof

of *knowledge* of the law's coverage, as well as intent to violate the law. Pulungan acted willfully only if he knew that Leupold Mark 4 CQ/T riflescopes are "manufactured to military specifications." It may be a fool's errand to try to list every riflescope that is made to military specifications, but the Directorate could avoid problems such as this by putting into the text of the regulation all riflescopes that it has tested and found to be covered. An "including but not limited to . . ." listing would take advantage of §2778(h), give notice to affected persons, yet not restrict the listing's domain.

As things stand, though, the only basis for inferring Pulungan's knowledge is the legend on the web page. We explained above why that is insufficient. If Indonesia had not so recently been subject to an arms embargo, then hugger-mugger alone might permit a jury to infer knowledge that a license was required. Pulungan's efforts to work through intermediaries, and to acquire 100 'scopes without placing one large order that might have set off warning systems, do not point in that direction, however. The prosecutor does not contend that Pulungan's emails and notes about the embargo were part of a ruse to create a defense for someone who knew that the embargo had been rescinded but that other laws might block exports. So the evidence is insufficient to show, beyond a reasonable doubt, that Pulungan knew that these 'scopes were "defense articles" that required export licenses, and the conviction is

REVERSED.