In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1837

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES A. SIMON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 10 CR 56 — **Robert L. Miller, Jr.**, *Judge.*

ARGUED FEBRUARY 10, 2012 — DECIDED AUGUST 15, 2013

Before RIPPLE and ROVNER, *Circuit Judges*, and COLEMAN,
*District Judge.*\*

ROVNER, *Circuit Judge.* A jury convicted James A. Simon of
filing false income tax returns, failing to file reports of foreign
bank accounts, mail fraud and financial aid fraud. He chal-

---

\* The Honorable Sharon Johnson Coleman, of the United States District
Court for the Northern District of Illinois, sitting by designation.

lenges the legal basis for his convictions on failing to file reports of foreign bank accounts and also contests the district court's decision to limit the evidence he could present in his defense on the false income tax return counts. He also contends that the court erred in its rulings on jury instructions, and he maintains that a reversal on some counts necessarily requires reversal on other counts. We affirm.

## I.

James Simon is a Certified Public Accountant, a professor of accounting, and an entrepreneur whose business dealings require a flowchart to unravel. At the center of Simon's financial life was JAS Partners, a Colorado limited partnership. Simon and his wife Denise[1] each owned one percent of JAS Partners. The Simon Family Trust (hereafter "the Trust"), based in the Cook Islands, owned the other ninety-eight percent. The Trust existed for the benefit of Simon, his wife and their children; the trustees were a Cook Islands corporation and a retired attorney. Simon's sisters, Sherri Johnson and Sandra Simon, each owned forty-three percent of Elekta Ltd, a Gibralter company for which Simon served as the managing director. The Simon sisters are retired teachers who entrusted the entirety of the business to their brother. Elekta owned nineteen percent of JS Elekta, a Cyprus corporation, also managed by Simon. JS Elekta, in turn, owned seventy-five percent of Ichua Company, a Cyprus corporation also managed by Simon. Ichua owned 100% of Intellecom, a Ukrainian

---

[1] Denise committed suicide several days after federal agents executed a search warrant at the Simon family home.

telecommunications business entity.[2] Simon thus was the managing director of three foreign companies, Elekta, JS Elekta and Ichua. In his capacity as managing director, he held signature authority over foreign bank accounts for each of these companies.

For tax years 2003 through 2006, the Simon family received approximately $1.8 million from JAS Partners, Elekta, JS Elekta, Ichua and William R. Simon Farms, Inc., most of this recorded as loans in Simon's personal financial records. Simon and his family spent approximately $1.7 million during this same period of time. Yet Simon paid just $328 in income taxes for 2005, and claimed refunds for the other three years, at the same time pleading poverty to financial aid programs in order to gain need-based scholarships for his children at private schools. The government charged Simon with four counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2; four counts of failing to file reports related to foreign bank accounts, in violation of 31 U.S.C. §§ 5314, 5322 and 18 U.S.C. § 2; eleven counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; and four counts of financial aid fraud, in violation of 20 U.S.C. § 1097 and 18 U.S.C. § 2. In his defense, Simon sought to demonstrate that the money he received from various entities was loaned to him and thus was not taxable. Alternately, he characterized the money he received as partnership distributions that were not taxable because they did not exceed his basis in the partnership. At worst, he

---

[2] Persons unrelated to the case owned the other fourteen percent of Elekta, the remaining eighty-one percent of JS Elekta and the other twenty-five percent of Ichua.

explained, he mischaracterized some of the transactions, but not in a manner that violated any criminal law. As for any failure to file reports regarding his signature authority over foreign bank accounts, Simon contended that the IRS did not require him to file these reports by the dates alleged by the government, that the IRS had extended the filing deadlines for the tax years in question past the date of his indictment, and that he filed the reports within the extended time period. The other counts, he contended, were largely dependent on the false income tax counts, and he therefore maintained that a failure to prove the income tax counts necessarily required reversal of the other counts.

In ruling on pre-trial motions, the district court rejected Simon's claim regarding the extended deadlines for filing reports of foreign bank accounts as a matter of law. The court concluded that the relief the IRS granted from civil liability for certain failures to report foreign bank accounts could not relieve Simon of criminal liability for offenses completed before the IRS granted the civil relief. The court also found that evidence related to the funding of some of Simon's business entities would be excluded except to the extent that Simon himself provided that funding. A jury subsequently found Simon guilty of four counts of filing false tax returns; guilty of three counts (one count was dismissed) of failing to file reports related to foreign bank accounts; guilty of eight counts (and not guilty of three counts) of mail fraud; and guilty of four counts of financial aid fraud. Simon appeals.

## II.

On appeal, Simon first contends that his convictions for failing to file reports of foreign bank accounts must be reversed because he filed the required documents within the time allotted by extensions granted by the IRS. He characterizes the issue as one of conflicting interpretations of the law by the Treasury Department and the Justice Department. He maintains that the courts should defer to the agency entrusted with implementing the statute at issue, in this case the Treasury Department, and that deferring to Treasury would require reversal of those counts. Second, Simon argues that evidentiary errors and jury instruction errors require reversal of his convictions for filing false tax returns. He complains that the court's rulings *in limine* prevented him from presenting a valid defense to the charges when he was not allowed to present certain evidence of his basis in JAS Partners. He also challenges the government's second theory underlying the false tax return counts: that the returns were false because Simon failed to check the "yes" box on Schedule B of his return in response to a question regarding whether he had signature authority over foreign bank accounts. If the conviction on the foreign bank reporting counts must be reversed, then the conviction on the false returns must also be reversed, he argues, because it was no more necessary to check the "yes" box revealing his signature authority over foreign accounts than it was to file reports for those accounts. Third, he maintains that the evidentiary errors he asserted on the false return counts led to an error in the jury instructions. Finally, Simon contends that if the false tax return counts are reversed, then he is also entitled to a new trial on the mail fraud and student loan fraud

counts, because these convictions were dependent on the validity of the false tax return convictions.

### A.

The Bank Secrecy Act of 1970, 31 U.S.C. § 5311, *et seq.* (the "Act"), requires "certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism." 31 U.S.C. § 5311. Section 5314 of the Act provides that the Secretary of the Treasury ("Secretary") "shall require … a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the … person makes a transaction or maintains a relation for any person with a foreign financial agency." Although the Act specifies the information that must be collected, it provides to the Secretary the discretion to prescribe the classification of persons subject to the law and regulations, the foreign countries to which record requirements may be applied, the magnitude and types of the transactions subject to record and reporting requirements, and the manner in which the information should be kept, among other things. *See* 31 U.S.C. § 5311(a)-(b). The persons required by the Act and its accompanying regulations to keep the designated records also must disclose them "as required by law." 31 U.S.C. § 5314(c). Willful violations of the disclosure requirements carry criminal and civil penalties. *See* 31 U.S.C. § 5322.

In each year from 2005 through 2007, Simon had signature authority over foreign bank accounts. Regulations in place at that time provided that Simon was required to file with the

Commissioner of Internal Revenue (hereafter "IRS") a Form TDF 90-22.1, "Report of Foreign Bank and Financial Accounts," also known as an "FBAR." *See* 31 C.F.R. § 103.24(a).[3] The deadline for filing FBARs was "June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R. § 103.27(c).[4]

Simon concedes that he did not file the required FBARs for each calendar year from 2005 through 2007 by June 30 of the next year in each instance.[5] He nonetheless contends that he did not violate the law because the IRS issued guidance in 2009 and 2010 that granted retroactive extensions for filing FBARs for the 2008 and earlier calendar years. The initial guidance, which we discuss below, was published in the form of frequently asked questions and answers, and this document purported to extend the deadline for filing FBARs to September 29, 2009. An IRS notice then extended the FBAR filing date to June 30, 2010, and a second IRS notice later extended the deadline even further to June 30, 2011. *See* IRS Notice 2009-62, 2009-35 I.R.B. 260, 2009 WL 2414299 (hereafter "Notice 2009-

---

[3]  In 2010, several regulations relevant to Simon's prosecution were superceded by new regulations. For example, in this instance, 31 C.F.R. § 103.24 was replaced by 31 C.F.R. § 1010.350. Nevertheless, section 103.24 was in effect at all times relevant to this appeal.

[4]  This regulation was superseded in 2010 by 31 C.F.R. § 1010.306(c).

[5]  The court dismissed Count 5 of the indictment, for failure to file an FBAR for foreign accounts in 2004, prior to trial. Simon was convicted on the three remaining counts for 2005, 2006 and 2007.

62"); IRS Notice 2010-23, 2010-11 I.R.B. 441, 2010 WL 672300 (hereafter "Notice 2010-23"). By then, Simon asserts, he had filed the required FBARs and thus could not, as a matter of law, face prosecution for his failure to meet the original deadlines. Indeed, he filed the FBARs prior to his indictment and within the extended deadlines set forth in Notices 2009-62 and 2010-23 (collectively the "Notices"). The government counters that Simon's crimes were complete before the IRS issued the Notices, and that the Notices cannot serve to absolve a person of his then-existing criminal liability for completed acts. The government also contends that amendment of a regulation does not relieve criminal liability for conduct occurring prior to the amendment, even when the amendment purports to have retroactive application. Moreover, the government maintains that the Notices specified only that the IRS would not impose *civil* penalties for persons whose failure to comply was not willful, but that nothing in the Notices evidenced an intention to relieve from criminal liability taxpayers who willfully failed to file their FBARs. Finally, the Notices did not apply to taxpayers like Simon, the government contends, who had not reported all of their taxable income, had not paid all of their taxes, and instead willfully violated the FBAR provisions.

We turn to the language of the Notices themselves as well as earlier guidance that the IRS published on FBAR issues. In March 2009, the IRS initiated the "2009 Offshore Voluntary Disclosure Program," intended to "get those taxpayers hiding

assets offshore back into the system."[6] *See* http://www.irs.gov/uac/Statement-from-IRS-Commission er-Doug-Shulman-on-Offshore-Income (last visited July 12, 2013). On May 6, 2009, the IRS posted on its website a series of Frequently Asked Questions ("FAQs") explaining the program to taxpayers in plain language. Several of the FAQs addressed FBAR issues, and one purported to extend the FBAR filing deadline:

> Q9. I have properly reported all my taxable income but I only recently learned that I should have been filing FBARs in prior years to report my personal foreign bank account or to report the fact that I have signature authority over bank accounts owned by my employer. May I come forward under the voluntary disclosure practice to correct this?
>
> A9. The purpose for the voluntary disclosure practice is to provide a way for taxpayers who did not report taxable income in the past to voluntarily come forward and resolve their tax matters. Thus, If [sic] you reported and paid tax on all taxable income but did not file FBARs, do not use the voluntary disclosure process.
>
> For taxpayers who reported and paid tax on all their taxable income for prior years but did not file FBARs, you should file the delinquent FBAR reports

---

[6] In its publications, the IRS sometimes refers to the Voluntary Disclosure Program as the "Voluntary Disclosure Practice," and we will also use those terms interchangeably.

> according to the instructions … and attach a statement explaining why the reports are filed late. Send copies of the delinquent FBARs, together with copies of tax returns for all relevant years, by September 23, 2009, to the Philadelphia Offshore Identification Unit. …
>
> The IRS will not impose a penalty for the failure to file the FBARs.

*See* http://www.irs.gov/uac/Voluntary-Disclosure:-Questions-and-Answers (last visited July 12, 2013). FAQ 7 instructs that taxpayers who are already under examination by the IRS are not eligible for the Voluntary Disclosure Program, and FAQ 14 explains that there are criminal penalties for failing to file FBARs.

Notice 2009-62 purports to address "technical issues" for certain FBAR filers and states that the Notice "provides temporary relief to those filers while formal guidance is developed." Notice 2009-62 also states that it "extends the due date for filing an FBAR for one year until June 30, 2010, for U.S. persons having signature authority over, but no financial interest in, a foreign financial account[.]" After referencing the earlier issued FAQs, Notice 2009-62 clarified that affected persons "have until June 30, 2010, to file an FBAR for the 2008 and earlier calendar years with respect to these foreign financial accounts. Thus, eligible persons that avail themselves of the administrative relief provided in this notice may need to file FBARs for the 2008, 2009 and earlier calendar years on or before June 30, 2010, to the extent provided in future guidance." Finally, the filing extension provided in the Notice

expressly "supplements the filing extension to September 23, 2009, previously provided by the IRS on its public website."

The "future guidance" referenced in Notice 2009-62 came the next year in Notice 2010-23. Public comment received after issuance of Notice 2009-62 led the IRS and Treasury Department to provide additional administrative relief:

> Persons with signature authority over, but no financial interest in, a foreign financial account for which an FBAR would otherwise have been due on June 30, 2010, will now have until June 30, 2011, to report those foreign financial accounts. The deadline of June 30, 2011, applies to FBARs reporting foreign financial accounts over which the person has signature authority, but no financial interest, for the 2010 and prior calendar years.
>
> …
>
> Provided the taxpayer has no other reportable foreign financial accounts for the year in question, a taxpayer who qualifies for the filing relief provided in this notice should check the "no" box in response to FBAR-related questions found on federal tax forms for 2009 and earlier years that ask about the existence of a financial interest in, or signature authority over, a foreign financial account.

Notice 2010-23. A third notice later extended further the deadline for FBARs for 2009 and earlier calendar years to November 1, 2011. *See* IRS Notice 2011-54, 2011-29 I.R.B. 53, 2011 WL 2409318 (hereafter "Notice 2011-54").

The government contends that Simon was not eligible for either the Voluntary Disclosure Practice or the administrative relief set forth in the FAQs and the Notices. Second, the government asserts, the crime was complete when Simon did not file the three FBARs on June 30 of the year following each calendar year at issue. Any subsequent notice issued by the IRS could not relieve criminal liability already incurred under the government's interpretation. Finally, the government insists that any relief granted by the FAQs and the Notices was strictly civil, and that the IRS could not and did not promise to retroactively relieve from criminal liability any persons who had already completed a criminal act when they willfully failed to meet the original deadlines.

Simon counters that the Treasury Department and IRS expressly granted retroactive relief to taxpayers like himself who had signature authority over foreign financial accounts. Simon characterizes the issue as one of conflicting interpretations of the regulations by the Treasury Department and the Justice Department. The Treasury Department, he contends, retroactively extended the deadline for filing FBARs for taxpayers like himself who properly reported all of their taxable income but failed to file FBARs by the original deadlines. In such a scenario, the FAQs directed taxpayers not to use the Voluntary Disclosure Practice but to simply file the FBARs by the new deadlines published in the FAQs and subsequent Notices. *See* FAQ 9; Notice 2009–62; Notice 2010-23. For these otherwise compliant taxpayers who simply failed to file FBARs by the original deadlines, the IRS promised it would "not impose a penalty for the failure to file the FBARs." FAQ 9. Simon reads that promise as applying to both civil and

criminal penalties. This asserted conflict between the Treasury Department and the Justice Department presents an issue of first impression, Simon contends, that can be answered by extending the principles set forth in *Director, Office of Workers' Compensation Programs v. Ball*, 826 F.2d 603 (7th Cir. 1987). Under *Ball*, Simon maintains that we must defer to the interpretation given to the regulations by the agency that is charged with administration of the statute and regulations. Although *Ball* involved two parts of the same agency, namely, the Director of the Department of Labor and the Review Board of that same department, Simon urges us to apply that principle here to defer to the Treasury Department's interpretation of the regulations here.

The government counters that there is no conflict between the Justice Department and the Treasury Department in the interpretations of the regulations. The Treasury Department never opposed Simon's prosecution and, in fact, the case agent and several testifying witnesses were IRS employees. As the government reads the regulations and the Notices, any relief granted was from civil penalties only. Moreover, the Notices expressed no intention to refrain from prosecuting persons like Simon who were already being investigated for wilfully violating the tax laws and wilfully failing to file FBARs. The government also maintains that the IRS could not, as a matter of law, extinguish criminal liability for crimes that were completed before any regulations were repealed or amended with new deadlines. Relying on *United States v. Hark*, 320 U.S. 531 (1944), and a number of similar cases, the government argues that the amendment of a regulation does not relieve

criminal liability for conduct occurring prior to the amend-
ment.[7]

We need not address the thorny issue of whether an IRS
Notice can retroactively wipe out criminal liability for an
already completed crime because, as we discuss below, Simon
is not one of the persons to whom the IRS granted retroactive
relief. That is, even if we assume solely for the purpose of this
appeal that the IRS has the power to retroactively relieve
criminal liability by publishing FAQs or Notices, we agree with
the government that Simon was not in the class of persons to
whom the relief was granted. As Simon himself notes, the IRS
Notices and FAQs address relief for two groups of taxpayers.

---

[7] The government notes that the Notices were "no more authoritative than
a regulation." Brief of the Plaintiff-Appellee, at 25. This is an understate-
ment. Official guidance from the Treasury Department and the IRS comes
in many forms. Regulations are typically issued first in proposed form in
a Notice of Proposed Rulemaking; public comment is invited and is
considered in both written form and through possible public hearings.
Final regulations are then published in the Federal Register, and we
generally defer to an agency's interpretations issued in this form, when the
regulations are issued pursuant to a specific directive from Congress. *See
Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 977-83 (7th Cir. 1998).
*See also* www.irs.gov/uac/Understanding-IRS-Guidance-A-Brief-Primer,
("IRS Primer") (last visited July 12, 2013). The Treasury Department also
issues guidance through revenue rulings, revenue procedures, private letter
ruling, technical advice memoranda, notices and announcements. IRS
Primer; *Bankers Life*, 142 F.3d at 978; *First Chicago NBD Corp. v. Commissioner
of Internal Revenue*, 135 F.3d 457, 459 (7th Cir. 1998) (revenue rulings, unlike
regulations that are subject to notice and comment, are entitled only to
"some weight"). Although we have not yet addressed the level of deference
due to IRS Notices, because they are issued without prior notice and
comment, they are likely due no more deference than revenue rulings.

First, through the Voluntary Disclosure Practice, taxpayers who failed to report all of their taxable income could come forward to belatedly report the income and resolve their tax liabilities while minimizing their chances of criminal prosecution. FAQs 3 & 4. But persons who were already under civil examination by the IRS were not eligible to participate in the Voluntary Disclosure Practice. FAQ 7. Second, persons who properly reported all of their income and paid all of their taxes but simply failed to timely file their FBARs could file their "delinquent" FBARs, along with a statement explaining why the FBARs were late.[8] In that instance, the IRS stated it would "not impose a penalty for the failure to file the FBARs." FAQ 9. Simon agrees that he was not eligible for the Voluntary Disclosure Practice. He claims it did not apply to him because he reported all of his taxable income; the government asserts he was not eligible because the IRS had already initiated a civil examination. No matter the reason, the government and Simon agree that he was not eligible for a program that, at most, minimized his chances for criminal prosecution.

Nor was Simon in the second group of taxpayers eligible for administrative relief. As we will discuss below, because he had not "properly reported all [his] taxable income," he was not eligible to avoid penalties (civil or criminal) for filing delinquent FBARs as described in the FAQs and the subsequent Notices that extended the filing dates further. *See* FAQ 9 ("Q9. I have properly reported all my taxable income but I only recently learned that I should have been filing FBARs …

---

[8]  Simon concedes he never filed a statement explaining why his FBARs were late.

A9. For taxpayers who reported and paid tax on all their taxable income for prior years but did not file FBARs, you should file the delinquent FBAR reports according to the instructions … by September 29, 2009"); FAQ 43 ("Taxpayers who reported and paid tax on all their 2008 taxable income but only recently learned of their FBAR filing obligation and have insufficient time to gather the necessary information to complete the FBAR, should file the delinquent FBAR report according to the instructions … by September 23, 2009"); Notice 2009-62; Notice 2010-23. FAQs 9 and 43, which extend the filing deadline to September 29, 2009, both refer to FBARs filed under the extended deadline as "delinquent" and both apply by their terms only to taxpayers who reported all of their income, paid all of their taxes and "only recently learned" that they should be filing FBARs. Notice 2009-62 specifically references FAQs 9 and 43, and expressly notes that the new filing extension to June 30, 2010 "supplements the filing extension to September 23, 2009, previously provided by the IRS on its public website." Notice 2010-62, in turn, notes that it is extending the relief provided in Notice 2009-62, extending the June 30, 2010 deadline to June 30, 2011.

Thus, the extensions described in the Notices applied only to the persons described in FAQs 9 and 43, persons who had properly reported all of their income, paid their taxes, and "only recently" learned of their obligations to file FBARs. Moreover, the late-filed FBARs were considered "delinquent" even if filed by the extended deadlines, but the IRS would not

impose penalties[9] for FBARs filed within these narrow parameters, so long as the affected taxpayers met the new deadlines and explained why the FBARs were late. As we will discuss below, at trial, the government proved that Simon had not "properly reported" all of his taxable income, and had not paid all of the taxes due, and he concedes that he never filed a statement explaining why his FBARs were late. Thus, as a factual matter, he was not eligible for any of the administrative relief described in the FAQs and the Notices. Indeed, by the time the IRS had decided to extend the FBAR deadlines for otherwise-complaint taxpayers, Simon was already under investigation by the IRS and was not even eligible for the Voluntary Disclosure Practice, a special program that minimized but did not eliminate the risk of criminal prosecution. So even if we assume that the IRS could grant "administrative relief" in a notice that would erase already-incurred criminal

---

[9] The IRS is empowered only to levy civil penalties, of course. Only the Justice Department may pursue criminal charges, and generally does so after the IRS has investigated a taxpayer and referred the case to the Justice Department. *See* 31 U.S.C. § 5321 (setting forth the power of the Secretary of the Treasury to impose civil fines for certain violations of the tax code); 31 U.S.C. § 5322 (setting forth criminal penalties for violations of the tax code); FAQ 4 ("The Voluntary Disclosure Practice is a longstanding practice of IRS Criminal Investigation of taking timely, accurate, and complete voluntary disclosures into account in deciding whether to recommend to the Department of Justice that a taxpayer be criminally prosecuted. It enables noncompliant taxpayers to resolve their tax liabilities and minimize their chances of criminal prosecution. When a taxpayer truthfully, timely, and completely complies with all provisions of the voluntary disclosure practice, the IRS will not recommend criminal prosecution to the Department of Justice.").

liability, it is clear in this instance that the IRS Notices did not extend that relief to taxpayers like Simon who had not reported all of their taxable income, had not paid all of their taxes and had not filed statements explaining why their FBARs were delinquent.

To the extent that the Notices and FAQs were relevant to the issue of wilfulness, the district court granted the government's motion *in limine* to exclude the Notices, and Simon has not appealed that ruling. In any case, Simon could not have seen the 2009 and 2010 Notices until several years after he had already violated the law requiring him to file FBARs for the 2005, 2006 and 2007 tax years. He could not have mistakenly relied on the advice given in the Notices because it had yet to be issued. To the extent the Notices were evidence that he lacked wilfulness because the Notices demonstrated that many taxpayers found the FBAR requirements confusing, Simon was not harmed by the exclusion of this evidence because he was able to bring forth other evidence that taxpayers found the requirements confusing. In sum, we need not decide whether the IRS had the power to retroactively eliminate criminal liability for FBAR violations because we affirm the judgment on the grounds that the extensions granted expressly did not apply to otherwise noncompliant taxpayers like Simon.

**B.**

We turn to Simon's claim of evidentiary error. Simon was charged with four counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2. The government sought to prove that the returns were false in two respects. First, Simon failed to indicate on Schedule B that he had access

to foreign bank accounts. Second, he failed to report all of his income. On this second theory, Simon sought to introduce evidence that any money he received from JAS Partners and the other business entities was not taxable because it was loaned to him by those entities and he was obliged to repay it. If the funds could not be legally characterized as loans, he wished to argue in the alternative that the money he withdrew from JAS Partners did not exceed his basis in the partnership, and thus the funds were non-taxable partnership distributions.

Prior to trial, the government moved *in limine* to exclude evidence regarding loans to Simon's business entities. Up to that point, Simon's defense appeared to be that the money he received from all of the business entities was not taxable income but rather constituted loans. The government conceded that legitimate loans *by* the businesses to Simon would not be taxable but that loans *to* the businesses by others were irrelevant to Simon's loan defense and would serve to confuse the jury. R. 77. Simon countered that loans to his business entities by others were relevant circumstantial evidence of how he usually conducted business. In other words, Simon contended that his history of borrowing and lending as a course of dealing in his businesses provided circumstantial evidence of whether the money he received personally from the assorted business entities were loans or taxable income. He also intended to demonstrate that, if he had loaned money to his business entities, repayment of those loans was not taxable income to him. R. 86. *See also* R. 95.

Prior to the start of trial and after hearing argument, the court entered a preliminary ruling on the matter:

As to the evidence of loans to Mr. Simon's business entities, I think the motion is well taken to the extent I—if I understand it, the motion is directed to whether the business entities received loans with which they then made the money transfers, and I'll ju8st [sic] call it that trying to find some neutral description, the money transfers to Mr. Simon, and I think the issues for jury determination relate to whether the money—the money transfers from the entities to Mr. Simon were loans or income and not how the entities acquired the money, and I think it might well be confusing.

This is the closest of the issues I'm ruling on, and I may well re-evaluate this during trial. But to the extent the Government's motion is directed to how the money came into the hands of the business entities, specifically whether it was a loan, I think, to the extent the business was doing something and got money as a result of it, that, obviously, would not create the same jury confusion.

Trial Tr. at 148-49. Simon's counsel sought to clarify and asked, "Are you saying that we cannot show, for example, that Mr. Simon's trust loaned the money to JS [sic] Partners that subsequently loaned or distributed monies to Mr. Simon?" Trial Tr. at 149. The court replied:

Yes, I am, and let me clarify it. I am saying that, and I may well re-evaluate when I understand better. But as I understand it now—and again, I read the briefs. I gave everybody a chance for argument. And

> I understand it, at this point, how the money got to
> JS Elektra [sic] wouldn't have anything to do with
> whether it would be a loan from JS Elektra [sic] to
> Mr. Simon. Now maybe there's more to it that I
> haven't understood yet, and I'll be happy to recon-
> sider it as we go along, but we've had two chances
> to educate me, and, at this point I don't understand
> what the relevancy would be as to how JS Elektra
> [sic] got it, and the time for educating me has passed
> because I've got a jury waiting for opening state-
> ments.

Trial Tr. at 149-50.

Trial commenced and the government presented its case-in-chief. Before the defense presented its first witness, counsel for Simon again raised the issue of money loaned to JAS Partners. Counsel informed the court that the defense's first witness would be Don Willis, a man who loaned $445,000 to JAS Partners in 2003 and 2004. Counsel contended that Simon signed for these loans on behalf of the partnership and was personally responsible for the loans as a general partner. Because Simon was personally liable on the loans, counsel contended, money that Simon received from JAS Partners was non-taxable to him:

> These documents—and we're going to have experts
> that are going to testify to the fact that JAS Partners,
> when they borrow the money from Mr. Willis—and
> there's another one, Mr. Scheumann—and Mr.
> Simon signed on the note as general partner, it's like
> him borrowing the money himself, and, therefore,

he could borrow it back from the partners or he could take the money as a distribution, and there's no tax effect on it, Judge, and that's the key to this whole case. There's no tax effect on his taking money from JAS Partners. It's his.

And the other thing … is that JAS Partners was comprised of James and Denise Simon and the Simon Family Trust, which was a 98 percent partner. The Simon Family Trust, which Mr. Simon funded, when it was established, he put in about 2,000,000 plus dollars of his own money, after-tax dollars. When they loaned money to JAS Partners, the same thing, Judge. It's Mr. Simon's money. He could take it out. He's a general partner. So it's all non-taxable, and that's the whole issue in the case.

Trial Tr. at 626-27. The government disagreed with this characterization of the law. Hearing what it perceived to be a new facet of the defense, the court then adjourned trial for the day and allowed the parties to file authority in support of their respective positions. The court then heard another round of arguments the next day.

In the new round of briefing, the government took the position that "the manner in which a partnership receives or categorizes funds bears no relation to the characterization of a payment of those funds from a partnership to its partner." R. 113, at 1. The government therefore sought to exclude all references to the characterization of funds that flowed between Simon's various business entities before those funds reached Simon's personal accounts. The government noted that, under

the tax code, when a partner who is not acting in his capacity as a partner engages in business with a partnership, the transaction will be treated as if he were not a partner. 26 U.S.C. § 707(a)(1); 26 C.F.R. § 1.707-1. Thus, in deciding whether a partnership's loan to a partner was a true loan, the court would look at the substance of the transaction and determine whether there was an unconditional obligation to repay the loan. *See Mangham v. Commissioner of Internal Revenue*, 1980 WL 4125 (Tax Ct. July 29, 1980). *See also DeSantis v. Commissioner of Internal Revenue*, 1997 WL 119799 (Tax Ct. Mar. 18, 1997). The factors assessed in determining whether a loan is *bona fide* include whether there is a sum certain, the likelihood of repayment, a definite date of repayment, and the manner of repayment. *Ibid*. Thus, the government argued, the manner in which JAS Partners (or any of the other business entities) obtained the money that it loaned to Simon was irrelevant to determining whether the loans to Simon were *bona fide* and non-taxable.

Simon countered that the court should allow evidence regarding (1) the nature of any third-party loans to JAS Partners; (2) the identity of the creditor; (3) whether the loans were guaranteed by Simon or his wife; and (4) whether they were *bona fide* liabilities for tax purposes. Simon also contended that partnership distributions to partners are tax-free to the extent that they did not exceed the partner's basis in the partnership. *See* 26 U.S.C. § 731 ("In the case of a distribution by a partnership to a partner – (1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution"). Simon

noted that a partner's adjusted basis is generally determined by 26 U.S.C. §§ 705. A partner's adjusted basis increases, Simon contended, when the partner's share of partnership liability increases. *See* 26 U.S.C. § 751 ("Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership."). Under Simon's theory, when a third party loaned money to JAS Partners, and Simon, as a general partner, became liable to repay that amount, his basis in the partnership increased by that amount. Any distributions to Simon up to the amount of those loans would be non-taxable under Simon's formulation because the distributions would not exceed Simon's basis in the partnership. Simon continued to maintain that the money he received from JAS Partners was in the form of legitimate loans that he intended to repay. But if the jury determined that the JAS Partners loans were not *bona fide*, then he intended to argue in the alternative that the disbursements could be recast as non-taxable constructive distributions that did not exceed his basis in the partnership. He therefore argued that evidence regarding loans by third parties to the partnership was relevant to his basis in the partnership and thus to the question of whether loans or distributions from JAS Partners to him were taxable. R. 114.

The next day, before resuming testimony, the court ruled on the evidentiary challenge. The court framed the issue as whether there was legal support for Simon's proposition that a loan to a partnership is a loan to a general partner. As the court interpreted Simon's written filing, the nature of outside

loans is important for tax purposes because loans can affect the partner's adjusted basis in the partnership. In particular, Simon argued that a partner's guarantee of a partnership loan is the equivalent of a recourse liability under the Treasury regulations. The court quoted Simon's argument that "outside loans to the partnership are directly relevant in determining whether such debt should be included in the general partner's tax bases [sic] and to ultimately determine whether subsequent partnership distributions to them are tax free." Trial Tr. at 638-39. *See also* Defendant's Memorandum of Law Regarding Evidence of Loans to a Partnership, R. 114, at 3. The court concluded that this argument was a "long way from a loan to a partnership being the same as a loan to the general partner." Trial Tr. at 639. Without additional legal support for the proposition that loans to JAS Partners increased Simon's basis in the partnership, the court was unwilling to allow evidence of those loans. The court was concerned that any minimal value of this evidence would be outweighed by the risk of confusing the jury. Trial Tr. at 640. More importantly, though, the court noted that there was a factual gap in the defendant's theory because Simon had no witness to testify about his basis in the partnership. Trial Tr. at 639. The court was also concerned that Simon's experts intended to testify to general legal principles, and so the court confirmed its earlier ruling on the motion, and extended it to exclude "all testimony, expert or otherwise, regarding the manner in which partnerships function for tax purposes, and the tax treatment of partnerships, as well as any testimony about JAS Partners receiving loans *from anyone other than the Simons*." Trial Tr. at 640-41 (emphasis added). The court thus did not prevent Simon from presenting factual

evidence regarding funds that he personally and directly supplied to the partnership. The court denied the government's motion to exclude evidence about JAS Partners and its purpose under the Economic Substance Doctrine. Finally, the court addressed the government's objection to the proposed testimony of Simon's expert Howard Richshafer. The court concluded that Richshafer, an expert on tax controversy, would not be barred but that he could not "tell a jury about the law." Trial Tr. at 642-43. Instructing the jury on the law was solely within the province of the trial court, and the court therefore precluded Richshafer from testifying to a general overview and operating rules of the tax code, the meaning of certain legal doctrines, an overview of grantor trust rules under the tax code, and a number of other legal matters.

As trial was about to resume, counsel for Simon asked whether he would be allowed to present evidence that the Simon Family Trust sold its interest in a company called Eye Pro, and that the proceeds then were loaned by the Trust to JAS Partners. Trial Tr. at 647-48. Counsel clarified Simon's theory that the sale of Eye Pro and other contributions to JAS Partners with after-tax dollars created a sufficient basis in JAS Partners to allow Simon to remove money from the partnership tax-free. The court then asked counsel to detail every piece of evidence that would be excluded by counsel's understanding of the court's ruling *in limine*. Counsel responded that he wished to present evidence of a $2 million after-tax contribution to the Simon Family Trust that went into the partnership when the Trust and Partnership were established; the sale of the Eye Pro business by the Simon Family Trust and the subsequent loaning of the proceeds of that sale to JAS Partners;

loans to JAS Partners by three individuals; an inheritance to Simon from his mother's estate that went into the Simon Family Trust and was then loaned to JAS Partners; and the sale of a home for $147,000 that went into the Simon Family Trust and was then loaned to JAS Partners.

With regard to the sale of Eye Pro, the court asked, "If the stock to the business belonged to the family trust and the stock or the proceeds from the stock were given to the partnership, why doesn't that create a basis for the trust, rather than for Mr. Simon, if the stock belonged to the trust?" Counsel replied:

> It's a grantor trust, Judge. The taxes have already been paid on that, and Mr. Simon contributed his after-tax dollars to this grantor trust, and so there's no tax consequence. When he puts it into the partnership, it increases his basis. It's like him just putting after-tax dollars that he had right into the partnership. What he did, he added to the trust, but he put the trust assets into the partnership.

> The point is, it's after-tax dollars, so there's no tax consequence that affects Mr. Simon in this way. It's just like putting – the money goes into the partnership, and then he takes it out, and it's the money that he already paid tax on, so it shouldn't be taxed.

Trial Tr. at 658. After hearing still more argument from both Simon and the government, the court concluded that Simon was free to argue to the jury that the money Simon received from JAS Partners was a loan or that it was a distribution but that he had failed to provide legal support for his argument that money transferred from the Simon Family Trust to JAS

Partners and loans from outside parties to JAS Partners increased Simon's basis in the partnership. The court therefore reaffirmed its ruling *in limine*.

On appeal, Simon contends that the court erroneously barred evidence (including expert testimony) related to his defense theory that the distributions he received were not taxable because the court misunderstood the legal issue. Specifically, he maintains that the court did not understand that partnership distributions are tax-free to the extent that they did not exceed the partner's adjusted basis of his interest in the partnership. The adjusted basis, in turn, is determined by the adjusted basis of property contributed to the partnership when it is formed, and further adjusted when the partner's share of partnership liabilities changes, as when there is a loan to the partnership. The specific basis evidence that Simon sought to introduce included loans by third parties to JAS Partners, $2 million in assets from the Simon Family Trust that was transferred to JAS Partners, an inheritance from his mother that was loaned to JAS Partners through the Trust, and the proceeds of the sale of a house that were transferred to JAS Partners through the Trust.

The government does not now disagree with the general proposition that a partner is taxed on distributions removed from a partnership only to the extent that the distributions exceed the partner's adjusted basis in the partnership. 26 U.S.C. §731(a). In reviewing the written and oral exchanges at trial surrounding this issue, it is apparent that the district court (against all odds, given the manner in which it was argued) also understood this general legal proposition but simply did not agree that the evidence Simon sought to introduce was

relevant to demonstrating his adjusted basis in the partnership. That is, the court found that Simon did not demonstrate how distributions among and between third party lenders, the Simon Family Trust and JAS Partners affected *Simon's* basis in the trust. The court expressly allowed Simon to present evidence regarding his own personal contributions to JAS Partners because it was clear to the court that Simon's own direct contributions would increase his basis in the partnership. But Simon failed to timely provide legal support for his convoluted, ever-evolving argument that third-party loans to JAS Partners and funds channeled through the Simon Family Trust into JAS Partners increased his basis in JAS Partners.

We review the court's decision to admit or exclude evidence for abuse of discretion. *United States v. Thornton*, 642 F.3d 599, 604 (7th Cir. 2011); *United States v. Boone*, 628 F.3d 927, 932 (7th Cir. 2010); *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010); *United States v. Wescott*, 576 F.3d 347, 355 (7th Cir. 2009). We will reverse and order a new trial only if any evidentiary errors are not harmless. *Thornton*, 642 F.3d at 604; *Boone*, 628 F.3d at 932; *Cooper*, 591 F.3d at 590; Fed. R. Crim. P. 52(a). Of course, a decision that rests on an error of law is always an abuse of discretion. *United States v. Smith*, 454 F.3d 707, 714-15 (7th Cir. 2006). Thus, if Simon is correct that the district court misunderstood the legal basis for the admission of the evidence, the decision to preclude Simon from presenting the evidence could constitute an abuse of discretion.

However, the court fully understood Simon's theory that the disbursements he received from JAS Partners were either legitimate loans or partnership distributions that did not exceed his basis in the partnership. The court excluded the

evidence of loans to JAS Partners by Willis and Scheumann because Simon failed to supply legal support for his claim that loans to the partnership increased his basis as a general partner. Indeed, after arguing that the loans increased his basis because "a partnership liability guaranteed by a partner is classified as a recourse liability under the Treasury regulations," and "recourse liabilities are includible in the tax basis of partnership interests held by general partners," defense counsel conceded that Simon did *not* guarantee the payment on loans to JAS Partners by Willis and Scheumann. *See* R. 114, at 3 (arguing that recourse liabilities, including a partnership liability guaranteed by a partner, increase a partner's basis in the partnership); Trial Tr. at 655 ("Mr. Scheumann and Mr. Willis, when they loaned money to the partnership, and Mr. Simon being a general partner in the partnership and, therefore as a general partner – I think I may have misstated, Your Honor, with regard to this, but what I meant to say was that *he didn't guarantee the payment*. As a general partner, he would be liable for the promissory note that the partnership had with Mr. Willis and Mr. Scheumann.") (emphasis added). Simon also failed in the district court to present any legal support for his claims that money he funneled through the Simon Family Trust to JAS Partners in undefined transactions increased his basis in JAS Partners. His sole support for that claim was an assertion that the Simon Family Trust is a grantor trust, but he cited no statutes, regulations or case law connecting that asserted fact to his personal basis in JAS Partners. *See* Trial Tr. at 664 (where the court noted, "We're here on Day Four of the trial, and I've seen no law at all. I've heard that there's experts that would testify that that is what the law is, but that's a

separate order *in limine*, no law to support this theory and, accordingly, will leave the order *in limine* where it is.").

Nor did he supply factual support for his basis in JAS Partners. Nothing in the record put the district court on notice that Simon's experts or fact witnesses would present factual support for his basis in JAS Partners. Simon sought to demonstrate his basis theory primarily through experts, including Herbert Long and Howard Richshafer. Simon's Notice of Proposed Testimony of Herbert Long, however, covered only his theory that the disbursements from JAS Partners were legitimate loans that Simon intended to repay and had the ability to repay. R. 82. A review of Simon's Notice of Proposed Testimony of Howard Richshafer reveals that Simon intended for Richshafer to instruct the jury largely on legal principles. R. 104. For example, Richshafer was to testify to "a general overview and the operating rules of Subchapter K of the Internal Revenue Code" and give "an overview of the grantor trust rules under Subchapter J of the Internal Revenue Code," among other things. R. 104, ¶¶ 5, 8. The court was correct to preclude any witness from generally explaining the law to the jury. *United States v. Farinella*, 558 F.3d 695, 700 (7th Cir. 2009). "District judges, rather than witnesses, must explain to juries the meaning of statutes and regulations." *Farinella*, 558 F.3d at 700. *See also United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (the meaning of the statute and regulations is a subject for the court, not for testimonial experts); *United States v. Jungles*, 903 F.2d 468, 477 (7th Cir. 1990) (trial court properly excluded expert's simple recitation of legal principles surrounding the "independent contractor" relationship). The jury is to apply the law as it is given by the court in its instructions,

and may not apply a legal opinion given by a witness, including an expert witness. *Farinella*, 558 F.3d at 700. Nonetheless, the court did allow Simon to present evidence of his own direct contributions to the partnership.

In the end, Simon simply failed to connect the dots of his complex transactions, and failed to timely supply legal authority that would support his theory that the transactions among and between his various business entities increased his basis in JAS Partners. The district court therefore committed no legal error and did not abuse its discretion in refusing to allow Simon to present this evidence to the jury. To the contrary, the district court took extreme care in deciding whether to allow this evidence, and gave Simon multiple opportunities to provide legal support for his claim that this evidence was relevant to his partnership distribution defense theory.

Moreover, a significant portion of the unreported income was entirely unrelated to JAS Partners. In particular, Simon received more than $663,000 from Elekta and JS Elekta, which were corporations, not partnerships. His main theory of defense for those disbursements was that they were loans that he intended to repay, a theory that he was fully able to present to the jury and that the jury clearly rejected. It is thus difficult to discern how Simon could have been harmed by the court's decision to exclude evidence related to JAS Partners when a significant portion of the income he failed to report (approximately one-third of the total amount) came from unrelated corporations. The partnership distribution defense could not have applied to money Simon received from Elekta and JS Elekta, providing a further reason for affirming Simon's conviction on the false tax return counts. *See Thornton*, 642 F.3d

at 605 (in determining whether an evidentiary error is harmless, we consider whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded); *United States v. Klebig*, 600 F.3d 700, 722 (7th Cir. 2009) (same). Again, though, we find no error in the court's decision to exclude certain evidence. But if the court had committed error in excluding evidence relating to the funding of JAS Partners, it is unlikely that error would have affected the verdict in light of the abundant evidence of unreported income Simon received from Elekta and JS Elekta.

Finally, the government also asserted that Simon's tax returns were false because he did not disclose on Schedule B that he held signature authority over foreign accounts. Part III of Schedule B, labeled "Foreign Accounts and Trusts," specifies that filers "must complete this part if you … (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust." Filers are asked to check either a "yes" or "no" box in response to the question, "At any time during [the filing year in question] did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" Filers are then directed to further instructions regarding the filing requirements for FBARS. Simon concedes he did not check the "yes" box for any of the years in question even though he had signature authority over a number of foreign accounts during those years. Both Simon and the government treated this issue as coterminous with the FBAR issue. That is, if Simon prevailed on the FBAR issue, he could prevail on the Schedule B issue. On the other

hand, if he lost on the FBAR issue, he also lost on his Schedule B defense. Notice 2010-23 specified:

> Provided the taxpayer has no other reportable foreign financial accounts for the year in question, a taxpayer who qualifies for the filing relief provided in this notice should check the "no" box in response to FBAR-related questions found on federal tax forms for 2009 and earlier years that ask about the existence of a financial interest in, or signature authority over, a foreign financial account.

Notice 2010-23, at ¶ 3. We have already determined that Simon was not a taxpayer "who qualifies for the filing relief provided in this notice" and so he was also not entitled to any relief for his failure to check the proper box on Schedule B. He has presented no separate argument concerning the government's charge that his tax returns were false in part because he failed to check the proper box on Schedule B. We therefore affirm his convictions on the false return counts.

## C.

Simon also contends that the court erred when it overruled his objection to a jury instruction regarding materiality. The instruction states, "A line on a tax return is a material matter if the information required to be reported on that line is capable of influencing the correct computation of the amount of tax liability of the individual or the verification of the accuracy of the return." Trial Tr. at 1053, 1080. The instruction came from the Seventh Circuit Pattern instructions, and defines materiality specifically for 26 U.S.C. § 7206, the statute under which Simon was charged. Simon offered the instruction himself

prior to the start of trial, but later objected because he had not been "allowed to put in the basis of Mr. Simon's interest in JAS Partners," and thus the jury could not determine the correct computation of his tax liability. Trial Tr. at 1053-54. "We review jury instructions *de novo*, but we will reverse a conviction only if the instructions as a whole misled the jury as to the applicable law." *United States v. Joshua*, 648 F.3d 547, 554 (7th Cir. 2011). Simon does not contend that the instruction misstated the law. Instead, his objection to the instruction is simply an extension of his argument regarding the court's decision to limit the evidence he could present regarding his basis in JAS Partners. As we have already concluded, the court did not err in limiting this evidence because Simon failed to timely supply legal support for the relevance of the evidence. The court committed no error in giving a pattern jury instruction defining materiality for the jury.

Simon also contends that the court's inclusion of this instruction, in combination with the *in limine* ruling, deprived Simon of his right to have the jury instructed on his theory of defense. There are a few problems with this contention. First, the court did not preclude Simon in general from making out his defense regarding distributions from the partnership that were not taxable to the extent that they did not exceed his basis in the partnership. The court simply limited certain pieces of evidence by requiring that Simon supply legal support demonstrating that a particular item or category of evidence was relevant to the computation of his basis. The court thus expressly allowed Simon to present evidence of his own direct contributions to JAS Partners because Simon supplied statutory support showing the relevance of this evidence. The court

also explicitly allowed Simon to present his defense that money he received from JAS Partners was a non-taxable distribution. *See* Trial Tr. at 663 ("the Defense is free to shift at any time right through final argument from saying, 'This was a loan,' to, 'This was a distribution.' There's no prohibition against that. The Defendant doesn't have to disclose its defense other than alibi or insanity upfront.").

More importantly, the jury was not instructed on Simon's distribution theory not because of any error by the district court but because Simon did not ask for jury instructions setting forth this theory until the final day of trial, even though he earlier had multiple opportunities to submit proposed jury instructions to the court. R. 87 (Defendant's Proposed Jury Instructions, submitted prior to the start of trial); R. 105 (Defendant's Supplemental Proposed Jury Instructions, submitted on the first day of trial). The court then refused to give the instructions because they were untimely, especially in light of the court's ruling days earlier that experts would not be allowed to explain the law, and that only the court could explain the law to the jury. Trial Tr. at 643 (where the court declined to allow Simon's experts to "tell a jury about the law," noting that "telling the jury about the law is my job, as the trial judge, and not the job of a witness, no matter how much expertise the witness brings to the stand."). R. 122 (Defendant's Supplemental Proposed Jury Instructions, submitted on the last day of trial); Trial Tr. at 1065-66 (where the court concluded, "I don't think I can find, in light of last Tuesday's ruling on the motion in limine, that it was a last minute discovery yesterday or today that witnesses weren't going to be able to testify to what the law is, so I will sustain the

objection to those late-filed instructions."). The court was concerned that the government had no adequate opportunity to respond to the late-filed instructions, and it was within the court's discretion to disallow the instructions under these circumstances. Trial Tr. at 1066. Notably, Simon has not appealed from the court's ruling that his final round of proposed instructions was untimely. But even if the court had found that the additional proposed instructions were timely, they were woefully incomplete in explaining the relevant law to the jury. Only two instructions addressed Simon's tax-free partnership distribution theory. The first stated, "If a loan from a partnership to a partner does not constitute a loan, the transaction can constitute a tax free distribution if it doesn't exceed its partners [sic] adjusted tax basis in the partnership." R. 122, at 4. The second stated, "To determine whether partnership distributions are tax free to a partner, the partners [sic] adjusted basis of his interest in the partnership must be determined." R. 22, at 11. Even if we take both of these propositions as true (and ignore the inherent contradiction in the first one), neither explains how the jury is to go about calculating Simon's basis, a crucial step in making out his defense. Simon apparently intended to have his tax experts explain the law regarding the calculation of basis to the jury, and the court properly excluded this testimony. That obliged Simon to propose legally-supported jury instructions on his defense, so that the court could instruct the jury. Having failed to submit the instructions, he cannot now complain that the court deprived him of his defense.

## D.

We finally turn to Simon's claims that reversal on some counts requires reversal on other counts. In particular, Simon argues that reversal on the FBAR counts alone would require reversal on the false income tax return counts because it would be unclear whether the jury convicted because he failed to report all of his income or because he failed to check the box on Schedule B indicating that he had signature authority over foreign accounts. He also contends that reversal on the false return counts would require a new trial on the fraud counts because those counts were based, in part, on Simon falsely understating his income. *See Yates v. United States*, 354 U.S. 298, 311-12 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978) (a verdict must be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected). Because we have determined that both the FBAR counts and the false tax return counts will stand, there is no basis to challenge the remaining counts under *Yates*. The judgment of the district court is therefore

AFFIRMED.