In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2514

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTONIO WEST,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 61 — **Charles P. Kocoras**, *Judge.*

ARGUED APRIL 6, 2015 — DECIDED DECEMBER 30, 2015

Before POSNER and SYKES, *Circuit Judges*, and SIMON, *Chief District Judge*.[*]

SYKES, *Circuit Judge*. Antonio West was indicted for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). The gun in question—an old M1 carbine—apparently belonged to his late father and was found in the

---

[*] Of the Northern District of Indiana, sitting by designation.

attic of the family home during a consensual search for a sto-len television. No fingerprints were recovered from the gun, and there was conflicting evidence about whether West actually lived at the house at the time. The government's case for possession rested heavily on West's admission to the police that the gun was his.

West's attorney moved to suppress the statement based on expert testimony that West has a low IQ, suffers from mental illness, and scored high on the Gudjonsson Suggestibility Scale, a psychological test that measures a person's degree of suggestibility. The district judge denied the motion, finding that West was competent to waive his *Miranda* rights and did so voluntarily. West's attorney then moved to admit the expert testimony at trial for three purposes: to assist the jury in assessing the reliability of the confession, to negate the intent element of the offense, and to explain West's unusual demeanor should he choose to testify. The government objected to admission of the expert testimony on the last two grounds but agreed that the evidence was admissible on the issue of the reliability of West's confession. The judge excluded the expert evidence altogether, and the jury found West guilty.

West argues that excluding the expert testimony was reversible error. We agree. The reliability of a confession is a factual question for the jury, and the expert's testimony was relevant and admissible on that issue. The government acknowledged as much in the district court, though it now defends the judge's ruling. Because the government's case turned largely on the jury's acceptance of West's confession, the exclusion of the expert testimony was not harmless error. We reverse and remand for a new trial.

## I. Background

At about 4:20 p.m. on June 3, 2010, the Chicago Police Department dispatched a report that several suspicious men were seen carrying televisions in the 1300 block of West 92nd Street. An earlier dispatch that day had reported a burglary and theft of two televisions in the same area. Officers Everardo Bracamontes and Michael Carroll responded to the neighborhood and saw several men carrying televisions into an apartment building located at 1330 W. 92nd Street. They entered the building and looked through the open door of one of the apartments, where they saw two televisions. They entered the apartment and detained everyone there, including Antonio West, who was holding a television.

The officers handcuffed West and moved him to their squad car. Another officer brought the burglary victim to the scene to identify the stolen property. Based on the serial number, the victim identified one of the televisions in the apartment as his. West, still in the back of the squad, was given *Miranda* warnings, waived his rights, and agreed to speak to the officers. He denied any involvement in a burglary but said he was paid $10 to carry the television into the apartment. The officers asked him where the second stolen television was. West hesitated at first, but then said it was in the attic of his house.

West consented to a search and gave the officers an address: 9238 S. Loomis Street. He signed a consent-to-search form for that address, which also appears on his state identification card. Although the officers didn't know it at the time, the Loomis Street residence was the home of West's late father, who had died about six months earlier. West apparently lived off and on in a nursing home or a mental-health

facility because he suffers from various mental-health conditions, but he used the Loomis Street residence as his mailing address. West informed the officers that a woman might be in the house when they arrived.

The officers went to the Loomis Street address and found a lived-in home with dishes in the sink and cans of food in the pantry. They located the stolen television in the attic where West told them it would be. Behind it was a loaded M1 carbine.[1] The rifle looked clean even though everything else in the attic was dusty. The officers confiscated both items.

At the police station later that evening, the officers questioned West about the gun. According to their trial testimony, West said the rifle was his and he kept it in the attic where it would be safe. When Officer Bracamontes mentioned that the rifle looked very clean, West said he cleaned it often. This interview wasn't recorded, however, and West did not sign a written confession.

A grand jury returned an indictment charging West with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). Based on West's criminal history, the government sought an enhanced penalty under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1).

---

[1] The M1 carbine is a .30-caliber semiautomatic rifle. It was a standard-issue firearm for American forces during World War II, the Korean War, and the Vietnam War. *See* WIKIPEDIA, *M1 carbine*, http://en.wikipedia.org/wiki/M1_carbine (last visited Dec. 29, 2015). The government traced the gun's manufacture to the Universal Firearm Corporation in Hialeah, Florida, in the late 1960s. A test firing confirmed that it was still in working order.

West's attorney moved to suppress his client's custodial statements and the evidence collected during the search, including the M1 carbine, ammunition, and a checkbook recovered from the house with West's name and the Loomis Street address on it. The defense attorney contended that West wasn't competent to understand and waive his *Miranda* rights or consent to the search. At the suppression hearing, counsel presented expert testimony from Dr. Steven Dinwiddie, a forensic psychologist who examined West and administered a number of psychological tests, including the Gudjonsson Suggestibility Scale, which showed that he was prone to changing his answers when confronted by an authority figure.[2] The government called a forensic psycholo-

---

[2] During the suppression hearing, Dr. Dinwiddie described the Gudjonsson Suggestibility Scale and West's results:

> It is just a read of how the individual responds to certain kinds of social cues, if you will.

> So, basically, you read a relatively short story; ask how much they are able to freely recall. In his case, not very much. And, then, give a series of forced choice answers: Was it A or was it B? …

> And some of these were factual, but some of them were misleading. …

> That is the purpose of the test, to see will they placate, if you will, the examiner by agreeing -- yielding -- to this kind of forced-choice scenario.

> And he generally did.

> …

> And there is a second round. And in that case you very sternly say something to the effect of, 'You know,

gist from the Federal Bureau of Prisons, who also examined West and administered several psychological tests. Both psychologists agreed that West has a low IQ—his verbal score is 73—and in addition suffers from significant mental illness.

The judge denied the suppression motion, concluding that despite these deficits West was competent to understand and intelligently waive his rights and that his statements to the police and the consent to search were knowing and voluntary.

West's defense at trial was that the gun belonged to his late father and he did not knowingly possess it in the sense required to find him guilty. A week before the trial, West's attorney filed a motion in limine seeking to admit the psychological expert testimony for three purposes: (1) to assist the jury in evaluating the trustworthiness of the confession; (2) to negate the intent element of the crime; and (3) to "assist the jury in assessing the defendant's somewhat unusual demeanor both in the courtroom and if he testifies." Curiously, the motion did not name the expert, though everyone

---

you have really got to do better than that. You didn't do a good job.' …

[In this round the question is:] Are they going to stick to, at least, what they recall they said and believed, or are they, under this pressure, going to shift. And he shifted in about half of the answers. …

I felt with all of the other sources of information, the nature of his illness, et cetera -- that this was, again, further information that he was somebody inclined to react in a very passive, placating way, who would not be very assertive in situations in which he was not going to have much power.

seems to have understood that it was Dr. Dinwiddie, the defense expert who testified at the suppression hearing.

The government opposed the motion, noting first that West had failed to comply with Rule 16(a)(1) of the Federal Rules of Criminal Procedure, which requires disclosure of a proposed expert's qualifications and opinions. The government also argued that West was trying to "raise[] an insanity defense (without calling it an insanity defense)" and was "improperly conflat[ing] the distinction between specific and general intent crimes." Importantly, however, the government did *not* object to admitting the expert testimony on the issue of the trustworthiness of West's confession. More specifically, the government's written response to the motion stated as follows:

> To the extent the defendant wishes to introduce expert psychological testimony as to the reliability of his confession—what the defense has called his "false confession," *see* Doc. Entry #93 at 2-4,—the government offers no objection other than to note the following important limitation: Under Rule 704(b), "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R. Evid. 704(b) … .

The day before the hearing on the motion, West's attorney submitted a formal notice clarifying that he proposed to call Dr. Dinwiddie, who would testify about West's perfor-

mance on various psychological tests, including the Gudjonsson Suggestibility Scale, just as he had testified at the suppression hearing. The notice stated that this expert evidence would help the jury evaluate "whether Antonio West's statement to the police was a true confession."

The judge denied the motion and precluded West from calling Dr. Dinwiddie at trial. The judge criticized the defense attorney for failing to follow "procedure or protocol" in naming the expert. But the judge's ruling was substantive, not procedural. He concluded that expert evidence of West's mental disability wasn't relevant because the § 922(g)(1) offense is a general intent crime. The judge also thought the expert's testimony would improperly invite the jury to acquit based on insanity: "[T]he kind of evidence you are putting on … is really, I think, a backdoor way of saying, 'My client was crazy; therefore, you should acquit him.'"

After the judge announced this ruling, the defense attorney reminded the court that he also sought to admit the expert's testimony on the issue of the trustworthiness or reliability of West's confession. Once again the government agreed that the expert testimony was admissible for this purpose but noted that Dr. Dinwiddie had not prepared a new report specifically addressing that subject. The judge ruled that the testimony wasn't admissible for *any* purpose, remarking that the jury might "confuse the issue of whether he is crazy or not."

During trial, West tried to introduce evidence of his mental disability in two other ways, but each effort was thwarted. The defense called West's cousin to establish that West lived in a nursing home due to his mental illness. The judge wouldn't permit this testimony, but he did allow the cousin

to testify that West lived at an address *other than* the Loomis Street residence where the gun was found. The defense also sought to establish that West had a state identification card listing him as disabled, but the judge excluded this evidence too.

The jury returned a verdict of guilty. West's criminal history triggered an enhanced penalty under the ACCA; the judge imposed the mandatory minimum sentence of 15 years.

## II. Discussion

West challenges the judge's decision to exclude the evidence of his various mental disabilities—primarily Dr. Dinwiddie's expert testimony, but also his cousin's testimony that he resided at a nursing home due to mental illness and the evidence that his state identification card listed him as disabled. We review evidentiary rulings for abuse of discretion. *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013).

Evidence bearing on the trustworthiness of a confession is generally relevant and admissible absent some specific reason to exclude it, such as unfair prejudice or juror confusion. *See* FED. R. EVID. 403. The probative weight of a confession is "a matter that is exclusively for the jury to assess," *Crane v. Kentucky*, 476 U.S. 683, 688 (1986), and courts may not exclude from trial "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence," *id.* at 690; *see also United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996) ("[I]t was certainly within the jury's province to assess the truthfulness and accuracy of the confession.").

We've explained before that competent expert testimony is admissible when it helps establish "that someone interrogating [the defendant] would experience difficulty obtaining reliable answers[] because [the defendant] was easily led." *Hall*, 93 F.3d at 1345. Indeed, our circuit's pattern jury instruction on confessions directs the jury to "consider all of the evidence, *including the defendant's personal characteristics*," in deciding how much weight to give a defendant's inculpatory statement. FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 3.09 (2012) (emphasis added).

Dr. Dinwiddie's expert testimony would have explained West's low IQ and mental illness and how these combined conditions might have influenced his responses to the officers' questions while in police custody. We think it plain that expert testimony that West is a suggestible, mentally ill person with a verbal IQ of 73 bears on the reliability of his statements to police. Testimony of this type is highly relevant to the jury's consideration of a defendant's "personal characteristics"—exactly the sort of evidence that a jury ought to be permitted to hear to assess the trustworthiness of the defendant's statements to the police. The judge did not abuse his discretion in disallowing the use of this evidence for the other purposes identified in the defense motion, but Dr. Dinwiddie's testimony was clearly relevant and admissible on the issue of the reliability of West's confession, as the government itself acknowledged.

The judge never addressed this ground of admissibility, instead concluding that expert testimony about West's mental disabilities would invite a "backdoor" insanity acquittal. That ruling misapprehended the primary ground of admissibility West had advanced in his motion, which in turn led

to the erroneous exclusion of evidence everyone agreed was relevant and admissible.

The government now makes much of the fact that West denied any involvement in the burglary, implying that he must not be very suggestible after all. That's an argument for the jury, which can be trusted to weigh Dr. Dinwiddie's testimony in light of the other evidence in the case. The government also criticizes the use of the Gudjonsson Suggestibility Scale, but again, that's an argument about the weight of the expert testimony, not its admissibility; the government did not object to Dr. Dinwiddie on Rule 702 grounds. Finally, the government reminds us that Dr. Dinwiddie testified at the suppression hearing about West's mental condition as it relates to his competence to understand and waive his *Miranda* rights and consent to the search; he did not address the more specific question of the reliability of West's statements to the police. But the government expressly *agreed* that the expert testimony was admissible for this purpose, so the concern rings a bit hollow. More importantly, the defense wasn't proposing that Dr. Dinwiddie offer an opinion about the trustworthiness of the confession, only that he be allowed to explain West's mental disabilities. The expert evidence was improperly excluded.

And the erroneous exclusion of this testimony cannot be deemed harmless. As we've explained, the government's case for possession rested largely on West's confession. Had Dr. Dinwiddie been allowed to testify about West's mental deficits, the jury might have discounted his statement that the gun was his and found the remaining evidence linking him to the Loomis Street residence—the checkbook and the address on his identification card—insufficient to prove be-

yond a reasonable doubt that he knowingly possessed the M1 rifle found in the attic of his late father's home. A new trial is warranted.

West also challenges the exclusion of the nonexpert evidence of his mental-health condition, but we think that's a closer call. This evidence includes his cousin's testimony that he lived in a nursing home and that West's state identification card listed him as disabled. Without the expert's testimony explaining West's low IQ and mental illness, this evidence may well have confused the jury. But *with* the expert testimony—and perhaps also a limiting instruction explaining the proper uses of this evidence—the confusion evaporates. In the end, the judge excluded this evidence for the same reason that he excluded the expert's testimony: he thought that *all* evidence of West's mental disability was irrelevant. We've explained why that conclusion was mistaken. The admissibility of the nonexpert evidence of West's mental disability should be reconsidered on remand.[3]

REVERSED and REMANDED.

---

[3] Invoking *Alleyne v. United* States, 133 S. Ct. 2151 (2013), West also argues that he was wrongly sentenced under the ACCA because the jury made no findings regarding his conviction record. Because we're remanding for a new trial, we do not need to address this sentencing argument other than to note that *Alleyne* specifically declined to address the continued vitality of *Almendarez-Torres*, 523 U.S. 224 (1998). 133 S. Ct. at 2160 n.1.